## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DEBORAH A. SNYDER, | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 12-1029-RGA |
| | : |
| MICHAEL J. ASTRUE, | : |
| Commissioner of Social Security, | : |
| Defendant. | : |

Benjamin A. Smyth, Esq., Wilmington, DE, Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, Wilmington, DE; Patricia A. Stewart, Special Assistant United States Attorney, Philadelphia, PA, Attorneys for Defendant.

## MEMORANDUM OPINION

September 30, 2013


ANDREWS, U.S. DISTRICT JUDGE:

Plaintiff Deborah A. Snyder appeals the decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying her application for Social Security Disability benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act. Pending before the Court are the parties' cross-motions for summary judgment. (D.I. 10, 14). For the reasons set forth below, the Court grants the Commissioner's Motion for Summary Judgment and denies the Plaintiff's Motion for Summary Judgment.

## I. Procedural History

Plaintiff filed her applications for SSI and SSD on November 1, 2004, alleging disability as of January 1, 2001. (Tr. 91-92, 545-48). That claim was denied both initially and subsequently upon reconsideration. (Tr. 46-50, 53-57). After a requested hearing, at which Plaintiff was represented by an attorney, an administrative law judge ("ALJ") issued a decision denying benefits. (Tr. 549-61). Plaintiff requested Appeals Council review of the ALJ's decision on September 13, 2007; the Appeals Council remanded on September 26, 2008. (Tr. 36, 540-44, 562-66). Pursuant to the remand order, another ALJ held a hearing at which Plaintiff was represented by an attorney and a vocational expert testified. (Tr. 725-67). That ALJ denied benefits in a decision dated June 9, 2011. (Tr. 16-33). The Appeals Council denied Plaintiff's request for review of that decision on June 14, 2012. (Tr. 9-12). Plaintiff filed an appeal to this Court. (D.I. 1).

## II. Plaintiff's Medical History, Condition and Treatment

Plaintiff was born in 1977. (Tr. 731). She has a high school education and has worked as a customer service representative, an optometry assistant, a cashier, and a restaurant assistant manager. (Tr. 31, 697, 699). Plaintiff claimed she became disabled on January 1, 2001. (Tr. 73).

2

She alleges degenerative joint disease, bipolar affective disorder, depression, and anxiety. (Tr. 91-92).

Ms. Snyder's detailed medical history is contained in the record; however, the Court will provide a brief summary of the pertinent evidence.

With regard to Plaintiff's physical disabilities, Dr. Fucci, one of Plaintiff's treating physicians, completed a Multiple Impairment Questionnaire on May 25, 2007. (Tr. 512-19). He stated that Plaintiff had marked limitations in grasping and reaching. (Tr. 515-16). He also stated that Plaintiff had moderate limitations in using hands for fine manipulation. (Tr. 517). Finally, he concluded that Plaintiff was in frequent pain and incapable of even low stress work because of her monthly doctor visits. (Tr. 517). He believed that Plaintiff had more bad days than good days. (Tr. 518).

Plaintiff was also treated by Dr. Glassman for hip and knee pain. As of May 30, 2001, Dr. Glassman noted that Plaintiff had reduced her pain levels. (Tr. 174). Dr. Glassman could not identify the cause of the pain as of July 2001. (Tr. 171). He noted that Plaintiff's MRI of her lumbar spine was unremarkable and electrodiagnostic testing was normal. (Tr. 178).

Dr. Raisis, who treated Plaintiff for right knee pain, noted that she should do well with continued conservative care. (Tr. 308). Another of Plaintiff's treating physicians, Dr. Cabral, noted that her reported polyarthralgia, or the pain reported in her two joints, was out of proportion to the clinical findings. (Tr. 216). When her bone scan was normal, Dr. Cabral declined to continue prescribing Percocet and instead referred her to pain management. (Tr. 214, 216).

Dr. Patterson performed a right volar ganglionectomy on Plaintiff. (Tr. 339). After the surgery, Plaintiff reported no numbness, tingling, or other complication. (Tr. 339). Plaintiff had a

3

full range of motion in her fist and wrist. (Tr. 339). Finally, Dr. Ivins' treatment notes document Plaintiff's complaints of pain. (Tr. 638). However, there is no mention of hand, wrist, or arm impairments. Dr. Ivins also noted that Plaintiff's pain was controlled and that she was able to cope and function. (Tr. 639).

At the hearing, Plaintiff testified herself that she had no problems with her wrist except for occasional soreness or stiffness with bad weather. (Tr. 750). She also testified that she occasionally uses a cane. (Tr. 748). Plaintiff testified that she can stand for up to an hour, walk for up to an hour, and sit for up to three hours, so long as she has opportunities to rest or lay down periodically. (Tr. 752-53).

With regard to Plaintiff's mental disabilities, Plaintiff was hospitalized at Rockford Center from February 18, 2002 through March 22, 2002. (Tr. 185-88). Her treating physician at that facility was Estrella Acosta, M.D. (Tr. 185). Dr. Acosta's discharge diagnosis was mood disorder and generalized anxiety disorder. (Tr. 185). Plaintiff was discharged with a GAF score of 65. (Tr. 185). In October 2003, Plaintiff began psychiatric treatment with Dr. Galvis. (Tr. 270). Treatment notes indicate that they met approximately once per month, and Plaintiff testified that these meetings lasted for fifteen to thirty minutes each. (Tr. 270, 373-39, 443-52, 461-66, 523-27, 608-12, 620-21, 760).

From July 22, 2004 through August 6, 2004, Plaintiff was hospitalized at Christiana Care Department of Psychiatry. (Tr. 276-95). Dr. Sweeney's diagnostic impression was that Plaintiff suffered from bipolar disorder and depression. (Tr. 281). Upon discharge, Plaintiff had a full range of affect, coherent thoughts, improved insight, and a significant improvement in mood. (Tr. 292).

Dr. Galvis completed four Psychiatric Impairment Questionnaires regarding Plaintiff's diagnoses and disabilities. In the first questionnaire, dated October 22, 2004, Dr. Galvis diagnosed

4

Plaintiff as bipolar, depressed, and suffering from panic disorder, agoraphobia, and borderline personality disorder. (Tr. 296). She had a GAF score of 45. (Tr. 296). Approximately two and a half years later, on May 16, 2007, Dr. Galvis completed another questionnaire. He diagnosed Plaintiff the same as in the previous questionnaire but stated that she had a GAF of 40. (Tr. 435). On February 8, 2010, Dr. Galvis diagnosed Plaintiff the same as previously, but with a GAF of 45. (Tr. 599). Finally, on April 8, 2011, Dr. Galvis diagnosed Plaintiff the same as previously, but with a GAF of 25. (Tr. 529).

On June 30, 2008, Plaintiff was admitted to Christiana Care Hospital for generalized shaking and weakness. (Tr. 589-97). At that time, Frederick Villars, M.D. performed a mental status examination on Plaintiff. (Tr. 593). Dr. Villars concluded that Plaintiff suffered from: anxiety; a possible substance-induced mood disorder, which could be due to withdrawal or abuse; a history of panic disorder that was controlled with medications; and a history of bipolar disorder, which was in remission. (Tr. 593).

**III. ALJ's Decision**

In her decision, the ALJ determined Plaintiff had not engaged in substantial gainful activity since January 1, 2001. (Tr. 21). The ALJ determined Plaintiff had severe impairments of degenerative joint disease of the knees, depression, anxiety, and borderline personality disorder. (Tr. 22-23). The ALJ further found those impairments did not meet or equal any of the listed impairments contained in Appendix 1 of the controlling regulations. The ALJ determined Plaintiff could not return to her past relevant work, but that Plaintiff retained the capacity to perform sedentary work with some limitations. (Tr. 23-31). The ALJ concluded Plaintiff could perform other jobs that existed in significant numbers in the national economy, including document preparer,

5

addresser, and surveillance systems monitor. (Tr. 32). Accordingly, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. (Tr. 32).

## IV. Standard of Review

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D.Pa. July 11, 2001)(citations omitted).

The Third Circuit has explained that

> a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really constitutes not evidence but mere conclusion.

6

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Even if the reviewing court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## V. Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382a(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform the five-step sequential analysis set forth at 20 C.F.R. § 404.1520. *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner should not review the claim further. 20 C.F.R. § 404.1520(a)(4).

7

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. If the claimant is not suffering from a severe impairment or a combination of impairments that is severe, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is able to return to her past relevant work, the claimant is not disabled.

8

If the claimant is unable to return to past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him or her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g)(mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## VI. Analysis

Plaintiff's first argument on appeal is that the ALJ failed to properly consider the opinions of Drs. Galvis and Fucci, meaning that the ALJ's determination of Plaintiff's residual functioning capacity ("RFC") was not supported by substantial evidence. Plaintiff also asserts that the ALJ improperly considered the opinion of her treating physicians in determining that Plaintiff's mental impairments did not meet or equal any of the listed impairments contained in Appendix 1 of the controlling regulations. Therefore, Plaintiff alleges, the ALJ's hypothetical question to the vocational expert based upon the RFC was improper.

*A. Substantial Evidence Supported the ALJ's Determinations on Opinions of Treating Physicians Drs. Galvis and Fucci in Deciding Residual Functional Capacity and Per Se Disabling Impairment*

The regulations checklist requires an ALJ to give great weight to a treating physician's opinion unless there is "contradictory medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d

9

Cir. 2000). The Third Circuit has stated that "an ALJ may not simply ignore the opinion of a competent, informed, and treating physician." *Russo*, 421 F. App'x at 190. According to the regulations, a treating physician's opinion is accorded controlling weight if the "treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record . . ." *Id.*

An ALJ is allowed to assign a lower amount of weight to a treating physician's opinion if it is not supported by the record, but the ALJ must apply the factors listed in 20 C.F.R. § 404.1527(d)(1)-(6) to determine the appropriate weight assigned to the opinion. The factors include: (1) examining relationship; (2) length, nature, and extent of treatment relationship and frequency of examination; (3) degree to which evidence supports the opinion; (4) consistency of the record as a whole; (5) specialization of the physician; and (6) other factors, such as any other information which would tend to support or contradict the medical opinion. 20 C.F.R. § 404.1527(d)(1)-(6).

The ALJ "must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Russo*, 421 F. App'x at 191. The ALJ is not allowed to disregard a treating physician's medical opinion based solely on his own impression of the record. *Dougherty*, 715 F.Supp.2d at 583.

The ALJ concluded that the opinions of Dr. Galvis and Dr. Fucci, two of claimant's many treating physicians, did not deserve controlling weight because they were not well supported by medical signs and laboratory findings. (Tr. 29).

With respect to Dr. Fucci, the ALJ concluded that his opinion was neither supported by the claimant's own testimony nor by the opinions of other treating physicians. (Tr. 31). As a result, the

10

ALJ did not give considerable weight to Dr. Fucci's opinion regarding claimant's limitation in the use of her hands and upper extremities or her limitations in sitting, standing, or walking. (Tr. 31).

In the Multiple Impairment Questionnaire completed by Dr. Fucci, he concluded that Plaintiff had marked limitations in grasping and reaching. (Tr. 515-16). Dr. Fucci also concluded that Plaintiff had moderate limitations in using her hands for fine manipulation. (Tr. 516). Dr. Fucci found that Plaintiff suffered from frequent pain, and that she was incapable of even a low stress work environment due to her monthly visits to the doctor. (Tr. 517).

Plaintiff was also treated by at least five other doctors for physical pain relating to her knees, back, and hands. None of those doctors doubted Plaintiff's claims of pain. However, Dr. Fucci was the only treating doctor who concluded that Plaintiff was markedly limited in her abilities. While an ALJ should give appropriate weight to the opinions of treating physicians, an ALJ cannot give controlling weight to the opinions of all treating physicians if their conclusions are inconsistent. In declining to rely on Dr. Fucci's opinion, the ALJ weighed heavily the small degree to which evidence supported that opinion and the inconsistency of the record as a whole. Based on the different conclusions presented by Plaintiff's many treating physicians regarding her pain, the ALJ's decision not to give Dr. Fucci's opinion controlling weight was supported by substantial evidence.

With regard to Dr. Galvis, the ALJ noted Dr. Galvis' status as a treating physician. The ALJ proceeded to rely on Plaintiff's testimony and the opinions of other treating physicians to conclude Plaintiff's mental impairments did not meet or medically equal any listed impairment. (Tr. 23-24, 29). The ALJ discussed Dr. Galvis' opinion further in evaluating Plaintiff's RFC, explaining that the ALJ did not give Dr. Galvis' opinion controlling weight because it was "not well supported by medical signs and laboratory findings," and noting that Dr. Galvis' statements that Plaintiff was

11

unable to work "include no specific clinical findings or mental status examination results and merely repeat the claimant's subjective allegations." (Tr. 29-30).

The ALJ determined that Dr. Galvis's opinion was inconsistent with his detailed treatment records and some of his own statements in his Psychological Impairment Questionnaires. (Tr. 29). The ALJ contended that Dr. Galvis's opinion was not supported by the claimant's own testimony about her daily activities. (Tr. 29-30). As a result, the ALJ gave considerable weight to Dr. Galvis's assessment of mild to moderate limitations because that assessment was consistent with the claimant's self-reported behavior. (Tr. 30). The ALJ did not give significant weight to Dr. Galvis's assessment of marked limitations in ability to maintain concentration, complete a normal work week, perform at a consistent pace, or perform "low stress" jobs. (Tr. 30).

In the Psychiatric Impairment Questionnaire that Dr. Galvis submitted on April 18, 2011, he concluded that Plaintiff had a GAF score of 25. (Tr. 529). In his three previous Psychiatric Impairment Questionnaires, Dr. Galvis gave Plaintiff GAF scores of 45 on October 22, 2004; 40 on May 16, 2007; and 45 on February 8, 2010. (Tr. 296, 435, 599). While a GAF score may fluctuate over time, Dr. Galvis provided no explanation for the sudden drop in GAF score to 25. His assessments on the questionnaire were unchanged from those on his past questionnaires with higher GAF scores. Because Dr. Galvis' GAF score was inconsistent with his other clinical findings and conclusions, the ALJ could refuse to give controlling weight to that conclusion.

Significantly, Dr. Galvis was not Plaintiff's only treating physician for her psychiatric disorders. Plaintiff was treated at Rockford Center for one month during 2002 by Dr. Acosta, who discharged her with a GAF score of 65. (Tr. 185). Plaintiff was also treated at Christiana Care Department of Psychiatry for two weeks in the summer of 2004. (Tr. 292). Upon discharge, Dr.

12

Calderoni concluded that Plaintiff had a full range of affect, coherent thoughts, improved insight, and a significant improvement in mood.[1] (Tr. 292). Finally, when Plaintiff was hospitalized for general shakiness and weakness in 2008, Frederick Villars, M.D. performed a mental status examination on her. (Tr. 593). Each doctor concluded that Plaintiff improved with treatment and appropriate medication.

Decisions of credibility are left to the ALJ when based on substantial evidence. *See Pysher*, 2001 WL 793305, *3. The ALJ looked to the examining relationship between Plaintiff and Dr. Galvis, the degree to which evidence supported Dr. Galvis' opinion, and the consistency of the record as a whole. The opinions of Plaintiff's other treating physicians, as well as Dr. Galvis' own inconsistencies, provided a basis for the ALJ to give less weight to Dr. Galvis' opinions.

Finally, the ALJ was not required to give controlling weight to Dr. Galvis in her consideration of whether Plaintiff had a *per se* impairment under Listing 12.04. Dr. Galvis never considered, applied, or analyzed Plaintiff's condition under the listing. Further, as discussed above, the ALJ was entitled to give Dr. Galvis' opinions less weight.

The ALJ relied on the opinion of Dr. Saul, a physician who did not actually treat Plaintiff. While the opinions of treating physicians are normally accorded more weight than those of doctors who have not examined the plaintiff, Dr. Saul was the only doctor that formally evaluated Plaintiff's claims under Listing 12.04. In so doing, Dr. Saul reviewed the treatment notes of Plaintiff's treating physicians. In conclusion, the ALJ relied on substantial evidence to accord little weight to Dr. Galvis for purposes of both the Plaintiff's RFC and Listing 12.04.

---

[1] The medical records provided regarding Plaintiff's 2004 hospitalization at Christiana Care Department of Psychiatry do not contain a discharge summary or a GAF score.

13

*B. The ALJ Did Not Err in the Description of Impairments in the Hypothetical Question*

The ALJ presented the following hypothetical to the vocational expert at Snyder's

hearing:

> [T]his person is aged approximately 23 years the date at the alleged onset,
> high school education, is able to read, and write, and do simple math, adding
> and subtracting. The hypothetical exertionally is sedentary. This work would
> also have posturals all occasional, and non-exertionally simple unskilled
> work, work that would have only occasional contact with co-workers and the
> public; work that's essentially isolated with only occasional supervision, and
> work that would be low stress, defined as only occasional changes in the
> work setting.

(Tr. 764).

In so doing, the ALJ described both Plaintiff's physical limitations and mental limitations.

The physical and mental limitations that the ALJ presented to the vocational expert were based on

appropriate medical evidence, as discussed above. Because substantial evidence supported the ALJ's

determination of the Plaintiff's RFC, which was the basis of the hypothetical to the vocational

expert, the ALJ's description of Plaintiff's impairments in the hypothetical question was not in error.

## VII. Conclusion

For the reasons discussed above, the Commissioner's Motion for Summary Judgment is

granted; Plaintiff's motion is denied. An order consistent with this opinion will be issued.

14